JOSEPH D. BRIGGS, Receiver &c. *vs.* GEORGE H. MITCHELL and CORNELIA MITCHELL.

Where a husband had a vested interest in the personal estate which his wife owned at the time of the marriage; *Held* that the subsequent reduction of it to his possession, even though a part of it came into his hands after the taking effect of the act of the legislature of 1848, " for the more effectual protection of the property of married women," did not change his title to it.

In respect to marriages occurring prior to that act, all the personal estate owned by the wife, at the time of the marriage, or acquired by her during coverture, if reduced to possession by the husband, immediately became his; unless there had been an agreement prior to the marriage, amounting to an ante-nuptial agreement; or, by some agreement between them afterwards, it became her separate estate; or was settled upon her by a post-nuptial settlement.

The *separate estate* of a married woman, is such property as is in some way settled upon her for her separate use, without any control over it on the part of her husband.

If the legal title to property is shown to have been in the husband, the *onus* is upon the wife, claiming it as her separate estate, to prove that it is such. This she cannot do, as against his creditors, by showing a conveyance to her, from the husband, without consideration.

A post-nuptial settlement, although it would be upheld in equity, as between the husband and wife, would be presumptively void as against antecedent creditors of her husband.

The wife cannot set up her equity in such a settlement, as against such creditors.

M. being indebted to his wife in the sum of $2120, for money received from her estate, and to other persons in a larger amount, and being insolvent, conveyed all his property, worth at least $4500, to L. for the purpose of securing the said sum of $2120 due to M.'s wife; and L. thereupon conveyed the same property to M.'s wife. *Held* that the property conveyed so far exceeded in value the amount it was intended to secure, that it was of itself sufficient to authorize the holding that the conveyance was fraudulent as against the antecedent creditors of M. without the finding of *actual* or meditated fraud.

And it appearing that it was a conveyance of not merely enough to secure the grantor's wife to the extent of the moneys claimed to have been received by him, but of all the remainder of his estate, and more than sufficient for the pretended object; and that there was a quiet acquiescence, by the wife, that her husband should use her estate as his own; he mingling it indiscriminately with his own, in business, for a period of from twelve to nineteen years, without a recognition of its separate existence by even a written receipt, memorandum, or separate instrument; and without his ever

having, during that period, accounted for interest or principal, or even talked about it, until his *bona fide* creditors were about to call for it;. it was *further held* that this was a kind of trust or settlement that could not be recognized by any rule of law or equity, to stand against the rights of M.'s antecedent creditors.

The case of *Schaffner* v. *Reuter,* (37 *Barb.* 44,) commented on and distinguished.

THIS action was brought by the plaintiff, as receiver, duly appointed in proceedings supplementary to execution, upon judgments separately recovered by two creditors, to wit: Hiram Palmer and Henry B. Smith, against the defendant George H. Mitchell, to set aside certain transfers of both real and personal estate from the judgment debtor, the said George H. Mitchell, to one Isaac Lawson; and from the latter to the defendant Cornelia R. Mitchell, who is and then was the wife of the defendant George H. Mitchell, on the ground that the same were made with intent to defraud creditors, &c. The transfers were made in May 1862. The defendants answered separately. The complaint alleges that at the time said transfers were made, the debts upon which said judgments were recovered existed, and the answers do not deny such allegation. It is also alleged in the complaint, and not denied in the answers, that the defendants were married in June 1838; that neither the said Lawson nor the defendant Cornelia, paid or advanced anything for the conveyances and transfers at the time they were made, and that the defendant George H. has no property out of which to satisfy the debts existing against him, except the property thus transferred to his wife. The complaint also averred that the property so transferred was, on the 5th of November, 1862, of the value, at least, of $8000; and the answer, while not denying this allegation, denies that it was or is worth $8000, without saying when; and alleges that it was not worth more than enough to pay the said defendant Cornelia her aforesaid claim, without stating how much property, in value, in the opinion of the defendant, that would require. Neither is

the allegation in the complaint that the defendant Cornelia had no separate estate, denied in the answer. But the answers of both defendants deny the intent to defraud, &c., and then affirmatively set up that the defendant Cornelia, at the time of her marriage, had a large estate, out of which she loaned to her husband, and placed in his hands, the aforesaid sum as and for her separate estate, but not as a gift, and the same was not otherwise reduced to his possession, and never belonged to him otherwise ; and that said transfers were made to pay the money so borrowed of her by her husband, the said George H.

The defense, therefore, depended exclusively upon the matters thus affirmatively set up by the defendants.

There were no exceptions taken to the evidence, upon the trial, the whole of which, upon the matters litigated, consisted in the examinations, under oath, of the defendants respectively, in supplementary proceedings which were put in by the plaintiff.

The cause was tried before his honor, Judge Bockes, at special term, who found and determined the facts of the case to be as follows :

That Hiram Palmer recovered two judgments against the defendant George H. Mitchell, for the amounts and causes of action in the complaint stated; which judgments were entered and docketed at the times and as therein stated ; and further, that execution was issued on each of said judgments, and the same were, and each of them was returned unsatisfied, as therein also stated and alleged ; and said judgments, and each of them, remain unsatisfied. That Henry B. Smith also recovered a judgment against said George H. Mitchell, for the amount and causes of action in the complaint stated; which judgment was entered and docketed at the time, and as therein stated; and that execution was issued on such judgment, and the same was returned unsatisfied, as therein also stated and alleged; which said judgment remains unpaid.

That proceedings supplementary to execution were taken in said action, and on such judgment, as· stated in the complaint, and which resulted in the due appointment of Joseph D. Briggs, the plaintiff herein, as receiver; and said Briggs was duly appointed receiver of the property and effects of said George H. Mitchell, in manner and form, and as stated in said complaint; and he was at the commencement of this action, and still is, such receiver. That at and after the accruing of the debts for which said judgments were recovered, the said George H. Mitchell was the owner of the real and personal property described in the complaint, of the value of several thousand dollars. That said George H. Mitchell owed other debts besides the debts above mentioned; and being so indebted, and at or about the time specified in the complaint, to wit: May 5, 1862, he transferred and conveyed his aforesaid property, real and personal, (except the Columbian Hotel property,) to Isaac Lawson, who immediately conveyed and transferred the same to Cornelia R. Mitchell, then and still the wife of said George, and who thereafter claimed to have held and owned the same as her separate property. That such conveyances and transfers of said property by Mitchell to Lawson, and by him to said Cornelia, were, and each of them was, made and effected by the said parties with the fraudulent purpose and intent to place the property so transferred and conveyed, beyond the reach of the creditors of the said George H. Mitchell, of which said Palmer and Smith were two, and to protect the same from the lien and claim of any judgment which might be obtained against him; and such transfer and conveyances were, and each of them was, made and effected by said parties thereto, with the unlawful intent to hinder, delay and defraud the creditors of said George, then existing, and to place the property out of their reach.

And, as matter of law, the judge decided and adjudged:

1st. That the aforesaid transfer and conveyance by said George H. Mitchell to said Isaac Lawson, and by said Lawson to Cornelia R. Mitchell, were, and each of them was, fraudulent and void as to the creditors of the said George, then existing, and especially as to said Palmer and said Smith, and as to their respective judgments aforesaid; and should be deemed fraudulent and void as against said judgments.

2d. That said judgments became, and were valid liens, and each of them became, and was a valid lien on the real property so as aforesaid transferred to said Lawson, and by him to said Cornelia, situated in the county of Saratoga; and such real estate was liable to be sold thereunder, the same as if such transfer and conveyance had not been made.

3d. That said plaintiff, Joseph D. Briggs, receiver as aforesaid, and as such receiver, was entitled, notwithstanding said transfers, to said property so transferred to said Lawson, and by him to Cornelia, and to the avails thereof, so far as should be necessary for the purpose of obtaining and making payment and satisfaction of the aforesaid judgments recovered by said Palmer and Smith, and the costs of the aforesaid proceedings supplementary to execution, and the costs of this action; which costs of this action were thereby awarded to him, (said receiver,) and to that end he was invested with the usual rights and powers of receiver in similar cases. And said Cornelia was required to deliver over to him, according to law, the aforesaid property so transferred to her, and to account to him for the same, and the avails thereof, to the end that the same might be duly and justly appropriated and applied as aforesaid; and judgment was ordered and awarded accordingly.

The defendants excepted to the findings of fact and law of the judge, and after the entry of judgment therein in favor of the plaintiff, appealed to the general term.

Briggs *v.* Mitchell.

*W. A. Beach,* for the appellant.

I. The court erred in refusing to find that this money was placed by the wife in the husband's hands, in trust for her. Whatever might be its legal effect, the fact was so. It was sworn to by the wife, and there was no conflicting evidence. It was important only to show the intent with which the money was received by the husband, and to rebut the idea that it was reduced by him to possession, by virtue of his marital right. The court chose so to regard it, in defiance of the evidence. Perhaps it may not affect the equitable rights of the wife. If it does, the error of the court is manifest.

II. The court erred in finding that the deeds were made with a fraudulent intent. The refusal of the court to qualify the finding, leads to the conclusion that the court intended to impute an actual, fraudulent intent, in fact, as distinguished from imputed fraud. If this be so, it is very great injustice. It is not countenanced by the proof. It may be that the law will pronounce the arrangement fraudulent against creditors, however honest and truthful its real purpose may have been. But upon the simple facts detailed by the wife, to charge actual fraud is unjustifiable.

III. The judgment against Mrs. Mitchell is wholly unsupported by the evidence. As against her, there is no proof of the husband's insolvency. For aught that appears, he had abundant means to satisfy creditors, independent of the property conveyed to the wife. There is no proof that the provision in her favor was exorbitant, or disproportioned to the amount of the wife's separate property received by the husband. Indeed, the value of the property transferred to the wife does not appear at all against her. The proof, then, is that the husband received the wife's estate, engaging to take care of it for her, and while indebted, but before any lien attached, conveyed this property, through a trustee, to the wife, there being no

proof of insolvency, or that the provision for the wife was immoderate. It is supposed a husband may settle property on his wife, making no more than an equitable provision, and retaining enough to satisfy creditors. (*Planck* v. *Schermerhorn*, 3 *Barb. Ch.* 644. *See Borst* v. *Corey*, 16 *Barb.* 136; *Carpenter* v. *Roe*, 10 *N. Y.* 227.)

IV. Considering the case in its fullest aspect, the precise question presented is, whether or not a court of equity, appealed to by the creditors of a husband, to reach his alleged property, can secure the equity of a wife, grounded upon the husband's appropriation of her separate property. It would seem as if the proposition admitted no argument. The power and the duty of chancery, in precisely such cases, have been so often affirmed and discharged as to become elementary. It is only by perverting and confusing the question, that dispute is maintainable. (*Clancy's Rights of Women*, 446.) It was insisted below, that transfers by the husband to the wife, injurious to creditors, are fraudulent and void. That *post*-nuptial settlements are subject to the same condemnation. That, upon marriage, the personalty of the wife becomes the property of the husband; and numerous authorities were unnecessarily cited in aid of these propositions. The doctrine upon which the defense rests is above and beyond all these propositions. Conceding them, it is yet true that from early times the court of chancery, with watchful and generous anxiety and care, has guarded what it calls the wife's equity. Even in ages more barbarous and illiberal than the present, when the separate legal existence of the wife was unacknowledged, and the senseless notion prevailed, that the individuality of the wedded woman was lost in the marital right, her equity was yet recognized and enforced. The error of the argument on the other side, consists in ascribing the principle to the force of a contract between the husband and wife. Such is not its origin or justification. It is readily granted that no post-

Briggs *v.* Mitchell.

nuptial arrangement, as such, can stand against the claims of creditors. The principle which secures the wife's equity rests upon independent and abstract considerations of morality and policy. It depends upon no contract, is governed by no stipulations, and yields to no other right. It is supreme and arbitrary, springing originally from an instinctive sense of justice, and fastening itself securely upon the equity jurisprudence of the world. Occasionally, the propriety and fairness of the rule has been doubted; but usually, and generally, the courts of every nation have commended and applied it. However sacred the rights of creditors may be esteemed, they often yield to the higher demands of nature and public good. The policy of a free state cultivates the family association, admits the supreme claim of natural justice, and subordinates the creditor to the family and the widow. Hence, our non-imprisonment and exemption laws; the homestead law; the widow's paraphernalia, and quarantine and dower. It is a very contracted range, both of law and public policy, which looks only to the circle of debtor and creditor. It is just that contracts should be performed, and that debts should be paid. But there are higher obligations than even these, and interests more hallowed and valuable than those of creditors. Little reason can be given why even a contract between husband and wife, securing to her a just support, in consideration of her property appropriated by the husband, should not be upheld. It has never happened, until now, that a court of equity, gaining jurisdiction over property, has failed to answer the claim of a wife to a just provision out of it, according to her real interest in it. The counsel for the plaintiff, in his argument below, entirely misconceived the nature of this discussion. He seems to think that it was circumscribed by the formal and precise law of contracts, and the incapacity of husband and wife to enter into property agreements. We ask the court to enlarge the subject to its just proportions, and see

Briggs *v.* Mitchell.

how intimately it associates itself with the best policy of a wise government, and commends itself to the best sentiments of our being. In another respect, as it seems to us, the opposite counsel argues erroneously. He maintains that the wife's equity never attaches, unless she brings a technical separate estate, consisting of realty. It would be difficult to imagine any meritorious reason for this distinction. We are speaking of equity.—of a rule which seizes an occasion to do right, in despite of technical law. The argument of the counsel admits the rule, if the wife's realty had been appropriated by the husband, but not if her personalty has been so used. What equity arises in the one case, not equally strong in the other? The principle is, that the husband has obtained the wife's property, and when his estate is to be distributed, she shall be equitably compensated. It is said that no equity springs from a wife's personalty, because the husband is absolutely entitled to that, upon marriage. Not exactly so; but admit it, and what then? Is her equity lessened? Or increased rather? It is easy to detect circumstantial differences, but the mind which rejoices in them, and fails to trace them to a principle, will never pierce very deeply the mysteries of reason. So far as equity is concerned, it matters not what the species of property received by the husband, through the wife, may be. The doctrine is, that he has received her property and spent it, and equity demands that she should not be left penniless and homeless. It rests, not upon the husband's right to appropriate, but upon the fact of appropriation. Besides, he has just as good a right to take rents and profits as chattels. He is tenant by the curtesy. In both cases the law gives him the power to receive. Where, then, is the distinction? And why should equity protect the wife in one case, and not in the other? We supposed the case of *Schaffner* v. *Reuter*, (37 *Barb.* 44,) decisive of this. It is sought to be distinguished upon the theory last considered; and, by

the force of verbal criticisms and inappropriate quotations from the opinion of the court, is very widely perverted. The fund received by the husband in that case, was the proceeds of the wife's realty, but it was "moneys, the proceeds of her real estate, advanced by her to her husband." And the court say, "the husband received from the wife a sum of money belonging to her absolutely, upon a parol promise to pay the same, at a time when the plaintiff's debt was not in existence." How exceedingly apposite to the present case. Here was money advanced to the husband, and by the wife, upon an implied undertaking to repay. "This parol promise, though void at law, was good in equity."

Nothing is better settled than that the husband, though entitled to reduce the wife's personalty to possession, "may deprive himself of such right, by an agreement before marriage, or a waiver in favor of the wife afterwards." (*Smart* v. *Comstock*, 24 *Barb.* 411.) Doing so, the property remains to the wife. Nor is it material how the waiver is created. As in the case cited, it may be by separate investment, or it may be, as in this case, by receiving it as a trust for the wife, to keep and invest for her. (*See also Smith* v. *Kane*, 2 *Paige*, 303.) It may, therefore, be said here, as in *Schaffner* v. *Reuter*, that the money belonged to the wife absolutely. It was hers before marriage. The husband waived his marital right, as he might do, and treated it as the property of his wife. It was partly invested in the purchase of a house at Poultney, and afterwards transferred to the Matilda street dwelling, conveyed to the wife. It appears that at least $500 of the $2120 received by the husband, was the proceeds of realty. And the reasonable inference from the proof is, that it all was. The $1500 was in a bond and mortgage "put out by executors," probably upon a sale of real estate. However that may be, the whole fund remained in the wife, as completely as if it had been realty, and more so; and

whether it did or not, is regarded by the defendants' counsel as utterly unimportant, in the light of the principle upon which we suppose the rule of equity under consideration rests.

It is thought that the case of *Schaffner* v. *Reuter* differs from the present, in the particular that the husband, there, promised to repay the money. Herein the counsel violates his own theory. That denies all force to contracts between husband and wife. The moment he concedes that the promise to pay raised an equity, he yields the case; because here was more than an equivalent. This was not a loan, as in the reported case, but a deposit, for safe keeping and investment; a trust, imposing more solemn obligation than promise of payment. In the search after petty differences, substantial analogies are overlooked. The promise to repay is only important as it manifests the recognition of an obligation to account, and a common intent that the wife shall be deemed the owner of the subject of the promise. However this intent may be expressed, if it appears in any form, it is effectual.

Again, it is said that in *Schaffner* v. *Reuter*, the property conveyed to the wife was but an equivalent for the principal of the money advanced by her to her husband. Obviously, the point thus suggested by the counsel has to do only with the extent of the wife's equity. Indeed it inferentially admits the equity, to the amount of the principal sum. But here again, as we conceive, principle is abandoned. It is true, the basis of the equity claimed is the property of the wife received by the husband, but the equitable allowance is graduated according to the circumstances and condition of the wife. The referee found, in the reported case, that the property there was "not more than a reasonable support" for the wife. And the court say that "the conveyance made to the wife by the husband, was no more than a just equivalent for the money borrowed of her."

Briggs *v.* Mitchell.

Whether, in this case, the equity of the wife is to be applied according to her necessities, or upon the idea of a "just equivalent for the money borrowed of her," she has received no more than she was equitably entitled to demand. In the first place, as against the defendant Mrs. Mitchell, there is no evidence whatever to show that the property conveyed to her was more than sufficient to pay the principal of her claim. Her answer denies that it was more than enough to pay her. The plaintiff has given no proof upon the subject. The deposition of her husband was ruled out, as against her. An expression in her deposition may, perhaps, be construed as averring that the property she received was worth about $4000. Assuming this to be so, it is submitted that $4000 is no more than should be justly allowed Mrs. Mitchell for her support. It would produce but $280 per year, subject to reduction by taxes, and to the costs, hazards and interruptions of investment. I shall not discredit the humanity of the court, by arguing in favor of the scanty justice of that amount. Regarded as a payment, the $4000 is but a just equivalent for the money borrowed. In this respect we are to regard the money received by Mr. Mitchell as the property of his wife, accepted by him under a trust, to keep and invest for her. In *Smart* v. *Comstock*, (24 *Barb.* 412,) the husband is spoken of as a trustee, under like circumstances. It surely will not be seriously contended that a trustee is not liable to account, with interest. In all species of indebtedness, interest is regarded as a "just equivalent" for the use of money. It is established by law as such an equivalent, and is uniformly so allowed. In this case the husband received the fund to invest and preserve, and ought to account, with interest. Considered as a question of equity solely, interest should be allowed. The intent of the parties was not that the fund was to lie idle, or be employed by the husband without compensation. It was not to be expended in family use. It was

to be kept and invested for the wife. Nor is the equity of the wife modified by the idea that for twenty-five years of her married life she has been protected and maintained by her husband. The duties and blessings of marriage are reciprocal and not unequal. It will be difficult to maintain that in a well ordered household, the preponderance of care or service, or sacrifice, is in favor of the husband. It is said further, that the usual rule in apportioning the wife's equity, is to allow her but half the fund. There is no rule on the subject. It is entirely a matter of judicial discretion. In the case of *Schaffner* v. *Reuter*, the whole fund was given the wife. And why should it not be here? The amount received by the husband, with interest, considerably exceeds the value of the property conveyed to the wife. It would be but a poor exhibition of equity which should refuse her, in her decrepitude and age, the enjoyment of her own.

*A. Pond*, for the respondent.

I. The moneys received by Mrs. Mitchell by inheritance from her father's estate, and which she owned at the time of and prior to her marriage with the defendant George H. Mitchell, was not separate estate at all; and hence the allegation in the complaint, that after her marriage Mrs. Mitchell had no separate estate, is sustained; and the averment in the answer, that at that time she owned estate, if deemed a denial of such allegation in the complaint, is disproved. "A separate estate, in a *feme covert*, only exists in such property, whether it be real or personal, as is settled upon her for her separate use, without any control over it on the part of her husband." (*Albany Fire Ins. Co.* v. *Bay*, 4 *Comst.* 11. *Willard's Eq. Jur.* 652.) Such, unquestionably, was the law at the time of the marriage of the defendants, in 1838.

II. By the marriage of the defendants, in June 1838, the defendant George H. Mitchell thereupon became

Briggs *v.* Mitchell.

vested with all the money and chattels then belonging to his wife; and this right was one pecuniarily valuable, and such as could not be abrogated or destroyed, and was not, by the acts in relation to married women, passed in 1848 and 1849. (*Ryder* v. *Hulse*, 24 *N. Y.* 372. *Westervelt* v. *Gregg*, 2*•Kern.* 202. *Kelly* v. *Small*, 2 *Esp.* 716. *Com.* v. *Manley*, 12 *Pick.* 173. *Washburn* v. *Hale*, 10 *id.* 429. *Wheeler* v. *Bowen*, 20 *id.* 563. *Reeves' Dom. Rel.* 1.) And, moreover, the husband is deemed a purchaser thereof for a valuable consideration. (*Howes* v. *Bigelow*, 13 *Mass.* 384, 390.)

III. The money, therefore, which the defendant Cornelia let her husband have, being money which she owned prior to and at the time of her marriage, thereupon became, by virtue of the marriage, absolutely his; and upon his reducing it to his possession, and by his taking and using it in his business for nineteen years, as he did the most of it, and some twelve years, as he did the balance of it, he did not thereby become the debtor of his wife at all. The money, upon his getting possession of and using it, was legally and equitably his, and therefore he had a right to use it, with or without his wife's consent; and hence such use of it by him did not constitute any consideration for the transfers in question. (*See cases cited to 2d point, and Searing* v. *Searing*, 9 *Paige*, 283, 287; *Borst* v. *Corey*, 16 *Barb.* 136; *Planck* v. *Schermerhorn*, 3 *Barb. Ch.* 644; *Reade* v. *Livingston*, 3 *John. Ch.* 481; *Pierce* v. *Thompson*, 17 *Pick.* 391; 2 *Story's Eq. Jur.* §§ 1402, 1403; *Blanchard* v. *Blood*, 2 *Barb.* 352–355; *Willard's Ex.* 189, 190; *Howes* v. *Bigelow*, 13 *Mass.* 384, 390.)

IV. The case does not belong to that class to which what is denominated the "wife's equity" is applied. That principle only applies to cases where the husband finds. it necessary to resort to equity in order to reduce the choses in action, or other property of the wife, to his possession. In such case the court, acting on the equitable principle, that he who asks equity must do equity, refuses its aid,

unless adequate provision is made out of the fund for the wife's support, in cases where the condition of the wife and children, if any, requires such interposition.    But in this case the husband appropriated the fund to his own use with his wife's consent, employed it for years in his business, without the aid of any court, either of law or equity, and hence the "wife's equity," if she originally had any in the fund, was effectually extinguished thereby. (*Udall* v. *Kenney*, 3 *Cowen,* 590, 599.    2 *Story's Eq. Jur.* § 1403.    *Willard's Eq. Jur.* 636, 637.    *Searing* v. *Searing*, 9 *Paige*, 283, 287.)    Under such circumstances, even the separate estate of the wife, or the proceeds thereof, the title to which was originally, unquestionably, in her, would be regarded as becoming vested in him, by gift from the wife, or otherwise, and the court would, after such a lapse of time, refuse to establish her title thereto, as her separate estate.    (*Shirley* v. *Lambert*, 3 *Edw.* 336. *Gage* v. *Dauchy*, 28 *Barb.* 622, *and cases cited in the opinion of the court.*)    A *fortiori*, it must be so, as to personal property, choses in action, or money of the wife derived therefrom, which by virtue of the marriage becomes absolutely the property of the husband, where he reduces it into his possession without resorting to a court of law or equity to aid him in so doing ; and where, too, as in this case, the wife voluntarily, and without any coercion or artifice on the part of her husband, places the entire fund in his hands, saying : "Take this money and keep it for me ; take care of it, as you are the proper person to do so now."    And the husband, without making any reply, much less any promise to repay it, in compliance with her request, and, as he had a right to do, passively takes it, keeps it for years, uses it in his business, to the knowledge of his wife, no account of it being kept by her.    Under such circumstances the court will not, tolerate the parties in electing to consider the husband a debtor to his wife for the money so received by him, and allow him con-

veniently to transfer all his property (some $8000 in value, as alleged in the complaint, and not denied in any way in the answer, except to impliedly admit that it was worth $7999.99,) to her, under a pretense that he is paying her a debt due from him to her, because he used some $2120 of money owned by her at the time of her marriage, and which by the marriage became his absolute property in law and equity.

V. But suppose the "wife's equity" in this fund was not extinguished when the defendant George H. received this money from his wife, and used it as he did? Still such equity cannot be asserted in this action.

1st. The answer does not set up any such defense, nor is there any fact alleged therein upon which to base such supposed equity.

The theory of the answer simply is, that the wife having money which she received from her father's estate, loaned it to her husband, and he borrowed it of her. Had this money been derived from her real estate, owned at the time of her marriage, or had it been derived from, or belonged to, her separate estate, there might be more plausibility in the theory; but in such case the answer should set up the facts, and show that the fund was thus derived. But nothing of this kind is alleged. On the contrary, it is merely alleged that she had money inherited from her father's estate, and loaned it to her husband. This simply shows that the money belonged to the husband, and that therefore the transaction could not be a case of loan at all.

2d. The evidence is equally insufficient to sustain the transfers on any theory relating to the wife's equity. It merely shows the receipt of money by the husband, which by virtue of the marriage belonged to him. Moreover, it shows no circumstances entitling the wife to support and maintenance out of this fund.

It does not appear that there are any children, and in fact

there are none; nor does it appear that the wife is in want at all; nor but that she has a large estate now, not reduced to possession by her husband, and had such estate at the time of the alleged transfers. Surely the court will not presume all such facts without any allegation of them, and without a particle of proof in regard to them. The court are not quite so anxious to cheat the creditors of George H. Mitchell out of their honest dues, as to presume all the facts necessary to authorize such a judgment, not only without evidence, but also in the absence, even, of any allegation in the answers to that effect.

VI. But suppose the transaction between the defendants to have been such that equity will now regard it as a loan, so as to authorize the husband, without fraud, to repay it; in such case, even, the transaction in question is fraudulent as to creditors.

According to Mrs. Mitchell's evidence, she let her husband have money:

| | |
|---|---:|
| In 1843, . . . . . . . . . . . | $1500.00 |
| " 1850, . . . . . . . . . . . | 500.00 |
| " 1851, . . . . . . . . . . . | 120.00 |
| Making, in all, | $2120.00 |

According to the answers, her husband transferred to her property to the amount, at least in value, of $4500, under pretense of paying this alleged debt. But if the fund was one in which the wife's equity was not extinguished by her husband's taking and using it, with her consent, as he did, still, so long as she lived with, and was supported by, her husband—and there is no pretense but that she has always hitherto resided with and been supported by him—the husband was entitled to the use of or interest on this fund, as an equivalent or compensation for such support. So that, in any event, he was not liable to her, nor was she entitled to recover of him, if at all, any more than the principal fund received, without inter-

est. (*Udall* v. *Kenney,* 3 *Cowen,* 590, 607, 610. *Estate of Hinds,* 5 *Whar.* 138. *Towers* v. *Haynor,* 3 *id.* 48.) Upon the evidence, therefore, this trasfer was fraudulent and void as to creditors, if for no other reason, because the debt, if there was one, was grossly. exaggerated, or the amount and value of property transferred, under pretense of paying such debt, greatly exceeded the debt, if there was one. There is no explanation or excuse for this palpable attempt to hinder, delay and defraud the creditors of George H. Mitchell. The transfers should therefore be set aside, and the judgment directing it is unquestionably right. (*Bailey* v. *Burton,* 8 *Wend.* 339. *Bank of Orange Co.* v. *Fink,* 7 *Paige,* 87, 93, 94. *Webb* v. *Daggett,* 2 *Barb.* 9. *Fiedler* v. *Day,* 2 *Sandf.* 594. *Mead* v. *Gregg.and wife,* 12 *Barb.* 653.)

VII. The case of *Schaffner* v. *Reuter,* (37 *Barb.* 44,) cited by the defendant's counsel, to sustain this fraud, has no application to the case at all. 1. The money which the wife let her husband have in that case, was derived from real estate owned by her at the time of her marriage, and to which she had an unquestionable and an absolute title; and the decision of the court and of the referee was placed expressly upon the ground that the money she let her husband have in that case was absolutely hers. On that point Judge Hogeboom says: "The husband received from the wife a sum of money, belonging to her absolutely, upon a parol promise to pay the same," &c. In this case the money was not derived from the real estate of the wife, owned by her at the time of her marriage, but was money at that time invested, in bond and mortgage, and subsequently paid in to the wife, and by her handed over to the husband. The money thus received by the husband, instead of being absolutely the wife's, was, as already shown, absolutely the husband's, and this distinction makes all the difference in the world between the cases. 2. In *Schaffner* v. *Reuter,* the husband promised to

pay back the money. In this case the answer does not allege any promise on the part of the husband to pay back the money to his wife; and if it does, the evidence of Mrs. Mitchell conclusively negatives it; and the decision of the court below thereon is final. 3. The case of *Schaffner* v. *Reuter* discloses that the property transferred did not exceed in value the principal sum received by the husband, without interest. 4. It appeared also in that case, that the wife had two children, and that the property transferred was not more than sufficient for a reasonable support for the wife and children. Nothing of that kind appears here. On the contrary, the general rule is to allow the wife only one half of the fund received by the husband in cases where she shows herself equitably entitled to anything. (*Willard's Eq. Jur.* 638.) And where there were children, and the husband was discharged as an insolvent, and the fund not larger than here, the wife was allowed but a portion, while the creditors were allowed the remainder of the fund. (*Napier* v. *Napier*, 1 *Dru. & Walsh*, 407. 5 *Har. Dig.*, *sup.*, 824. And see *Vaughan* v. *Buck*, 13 *Simons*, 404.) Instead of conforming to the general rule applicable to the case above stated, the wife, in this instance, where the fund received was but $2120, and the property of the husband worth $4500 at least, and the husband's debts only $3000, concluded that her "equity" warranted her in taking the whole, leaving nothing for the creditors. Without pursuing the subject further, it is apparent that the case of *Schaffer* v. *Reuter* has no application to this. There the fund was derived from real estate confessedly the property of the wife, and which was not converted, by force of the marriage, into the property of the husband; while here the money did not come out of the real estate, but was the proceeds of a bond and mortgage, a chose in action, the proceeds of which, as soon as realized, became absolutely the property of the husband. The case of *Schaffner* v. *Reuter*, more-

Briggs *v.* Mitchell.

over, does not profess to overrule *Borst* v. *Corey*, (16 *Barb.* 136,) nor *Planck* v. *Schermerhorn*, (3 *Barb. Ch.* 644,) in both of which cases the fund. was derived from the personalty and not the real estate of the wife; and these last mentioned cases, therefore, constitute direct authorities for the plaintiff in this action. The distinction is also well illustrated in the case of *Pierce* v. *Thompson*, (17 *Pick.* 391,) where it was held that a deed of the husband was without consideration where it was executed under pretense of paying for a chose in action of the wife after it was reduced to possession, or for the money received by the husband, derived therefrom. (*See Bullard* v. *Briggs*, 7 *Pick.* 533.) In no case does it appear that a post-nuptial settlement of the husband upon the wife has been sustained as against creditors of the husband, where the consideration of it was not some right of the wife in real estate, or its proceeds, transferred to, or received by, the husband, or relinquished for his benefit; or that the promise of the husband relied upon was expressly made before reducing the chose in action of the wife to possession by him. In such case there might be an equitable consideration to support the promise; but in this case the fund was money received from the wife, and it is not alleged that the husband made even a parol promise to repay the money; and it is proved that he did not even make that. The transfers and conveyances in question were, therefore, properly set aside, on the ground that they were made without consideration, and were fraudulent in law, and void as against the crediters of the grantor, George H. Mitchell.

VIII. But if there is any doubt upon the proofs as to whether the transfers in question were fraudulent and void as matter of law, still the evidence is ample to sustain the findings of the judge upon the facts, as to the want of consideration and the intent to defraud; and his decision thereon is conclusive, and will not be reviewed on appeal.

1. The testimony of Mrs. Mitchell, in the supplementary proceedings, put in evidence on the trial, states that she let her husband have $1500 in 1843, $500 in 1850, and $120 in 1851; that she supposed 'and knew that he put it in his business and used it, and "this last winter is the only time we had any conversation about it, when it became necessary for us to talk about it;" that when her husband took the money, she handed it to him herself, and said: " Take this money and keep it for me; take care of it, as you are the proper person to do so now. I think this was all that was said." If the manner of putting this money in her husband's hands, by Mrs. Mitchell, as thus stated by her, does not of itself show affirmatively an entire and voluntary surrender and relinquishment of this money to her husband, and of all equity in title to and control over it to him, then certainly the long silence— amounting to nearly twenty years as to most of it—that intervened, without her saying anything upon the subject to her husband, knowing all the time he was using it as an owner, was a circumstance that authorized the judge to say that she originally intended thereby to do so. If so, and this was exclusively a question of fact, then she waived all equity, if any she might have had in the fund, and the title of the husband thereto became absolute. ( *Willard's Eq. Jur.* 639. *Udall* v. *Kenney,* 3 *Cowen,* 590, 599. *Shirley* v. *Lambert,* 3 *Ed. Ch.* 336, 338. *Gage* v. *Dauchy,* 28 *Barb.* 622.) The transfers were therefore without consideration, and hence must necessarily be deemed to be made with an actual fraudulent intent, as there was no lawful intent for which they could have been executed; and the only effect that could be accomplished thereby, was to hinder, delay and defraud creditors. ( *Webb* v. *Daggett,* 2 *Barb.* 9.) But again, Mrs. Mitchell testified that she and her husband never talked it over "until it became necessary for us to talk about it." What was that necessity? All we know is, that in the winter, according to the

complaint, the allegations in which, in this respect, are not denied in the answers, Mr. Mitchell owned all the property transferred to Mrs. Mitchell, alleged to be worth $8000, together with a hotel and other property, and in the succeeding spring we find him spring poor, an insolvent, executions returned unsatisfied against him, and Mrs. Mitchell claiming to hold by transfer from her husband, through the medium of a third person, all his available property, leaving outstanding debts against him. Verily, the necessity for conversation and talk between her and her husband appears; and what is it? Why, under pretense of securing the wife's equity in $2120. Mr. Millard, who, "done her business," has property to the amount of $4500, at least, according to the answer, transferred by her husband to her. Besides, when Mrs. Mitchell received the conveyances, and became, as she supposed, reinstated in her equity, she did not deem it worth while to give any receipt or discharge to her trustee; nor did she ever have any looking over with him. And although there were papers executed at the time, the defendant's counsel did not deem it necessary or prudent to produce any upon the trial. Under all the circumstances, it seems, that the decisions of the judge upon the facts, as to Mrs. Mitchell's intent to defraud, are well sustained by the evidence, and should not be disturbed; and that against her husband is more overwhelming still. 2. But all the evidence on this question, aside from the pleadings, consisted of the sworn declarations of the defendants themselves. Under the circumstances, therefore, it was entirely competent for the judge to credit such parts of the admissions of the defendants as tended to charge them, or reject such parts, if there were any such, as tended to discharge them from liability in this action; and his decision thereon is not the subject of review upon appeal. (*Bearss* v. *Copley*, 6 *Seld.* 93. *Roberts* v. *Gee*, 15 *Barb.* 449.)

*By the Court,* POTTER, P. J. The defendants were husband and wife, married in 1838. The defendant Cornelia, at the time of her marriage, had about $2000, invested in bond and mortgage and in other sucurities, by the executors of her father's estate. There was no ante-nuptial or post-nuptial agreement between the defendants in relation to the wife's estate.

The defendant George H. Mitchell received about $1500 of this money that had belonged to his wife, in the year 1843, and the remainder about the year 1850. When the defendant Cornelia received the money, she says: "I handed it to my husband. I said take this, and take care of it for me; I took no receipt or note; there was nothing else said, that I recollect." This was in relation to the amount last received. When she received the $1500, she says: "It was paid to me in Poultney, Vermont; I handed it over to my husband to keep for me; he gave no writing back to me;" "I said, take this money and keep it for me; take care of it, as you are the proper person to do so now; I think this is all that was said; the money was put into the house at Poultney; the title to the house was taken in his name." In relation to the whole money, she also says: "I agreed to let him have money before we were married; I told him I had money, that I wished him to take care of it for me." The testimony of the defendant George Mitchell in relation to the money, is still more brief. He says: "Before marriage—it may have been a day before, or a week, or two weeks—she agreed to loan me some money; this is the substance of all that was said about it." "There was an oral agreement after marriage—impossible for me to state when. Whenever or wherever anything was said, it was talked of as a loan to me, and nothing else." This evidence is all that relates to the question of title to the estate that was in the defendant Cornelia Mitchell, prior to the marriage, or in

relation to any agreement prior or subsequent to the marriage.

In the absence of any ante-nuptial agreement, the common law had been, and it has remained unchanged from the day that Lord Coke wrote the common law of England, and it continued to be the law in this State until the statutes of 1848 and 1849, that marriage is an absolute gift to the husband of the goods, personal chattels and personal estate of which the wife was actually and beneficially possessed, at the time of her marriage, in her own right, and of such other goods and personal chattels as come to her during the marriage. (*Co. Lit.* 351, *b.* 1. *McQueen on Husband and Wife*, 18, 19. 1 *Bright on Husband and Wife*, 34.) *Blackstone*, who agrees to this as the law, says "that it is also generally true, that all compacts made between husband and wife when single, are voided by the intermarriage." (1 *Com.* 442.) Of the wisdom of this law, or the question whether our statutes have not since made wiser provisions in regard to the rights of married women, is not here to be decided.

Blackstone claims that the suspension of the legal existence of woman, during coverture, by the union of two persons into one, and the disabilities which follow or result, are for the most part intended for her protection; and with perfect English gravity he tells us, "that this is evidence to show how great a favorite is the female sex, of the law of England." (1 *Black. Com.* 445.) It does not seem to be looked upon in that light by the more modern legislation of this State. Her separate existence for certain purposes, her capacity and competency to contract, convey and devise her estate, are here acknowledged for the same reason that ignores it in England, "to show how great a favorite is the female sex" in this State, not only, but to admit, as is justly her due, her better right, and equal capacity and judgment, in the control of her own estate. Though it is not, perhaps, necessary for us

to pronounce upon the wisdom of these two adverse theories. We but pronounce the law to be as we find it, in its application to the rights of the parties at the time. Since our statutes have changed the law in this regard, the administration of the law, under two different rules—the one applying to the effect of coverture upon the personal estates of the wife *before,* and the other to its effect upon the same kinds of property *since* those statutes—has created some apparent conflict in cases relating to that subject.

The coverture in this case being *prior* to the enactment of our statutes, at a time when, as was said by Judge Denio, in 2 *Kern.* 419, " a separate personal property in the wife was unknown to the common law, which considered the husband to be the owner of all the goods of the wife ; and that all personal estate in possession of a woman vested absolutely in her husband, at the moment of marriage, and all which she acquired during coverture immediately became his, excepting only her contingent interest in choses in action not reduced to possession, which, in case of her surviving her husband, she retained the title to." In this case the husband had a vested interest in the personal estate which his wife owned at the time of his marriage to her, and the subsequent reduction of it to his possession, even though a part of it so came to him after the taking effect of the acts of 1848 and 1849, in relation to the estates of married women, did not change his title to it. (*Westervelt* v. *Gregg,* 2 *Kern.* 202, 209.) Such property belonged to him, unless there had been some agreement prior to the marriage, amounting to an ante-nuptial agreement, of which there is no evidence; or unless by some agreement between her and her husband afterwards, it became a separate estate ; or he settled it upon her by a post-nuptial settlement, which, if made, must be inferred or implied from the conversations between them at the time of handing over the money, which

we have set forth above. We have seen no evidence of such agreement. It would be extremely difficult to construe that language into a settlement, and it was not even attempted to be done on the argument; but that which is nearly equivalent, is urged upon the points.

It is attempted to be reasoned that the language referred to constituted a *trust.* There are at least three answers, each fatal to this claimed creation of a *trust.*

*First.* The disability of coverture to make a valid contract between them.

*Second.* The want of evidence to authorize the finding that such a trust was created.

*Third.* The want of consideration to support such a contract.

1st. *Blackstone* says, (1 *Com.* 442 :) "A man cannot grant anything to his wife, or enter into covenant with her, for the grant would be to suppose her separate existence; and to covenant with her, would be to covenant with himself." The husband and wife being one person in law, the former cannot in law, after marriage, by any conveyance at common law, give an estate to the wife, nor the wife to the husband. (*Co. Lit.* 112, 187, *b.*)

2d. The husband's evidence negates the idea of its being a trust. He says: "Whenever and wherever it was spoken of, it was to be a loan, and nothing else." Nor does her testimony conflict with this statement. She says: "I handed it to him to take care of it for me." There is nothing in all this that approaches to the creation of a trust, or from which to imply a relinquishment of his right and title to the money." (*Ryder* v. *Hulse*, 24 *N. Y.* 372.) A trust and a loan are terms of such indefinite meaning in common use, having different meanings in the minds of different persons, that we must adopt these terms according to their legal meaning in this case, unless the proved agreement constitutes the transaction a trust or a loan. If one lend another money at interest,

and take his obligation to pay it, this constitutes neither a loan nor a trust, in law. A loan is strictly a bailment; but á discount is, in common parlance, often confounded with a loan. To create a trust, there must be, 1st, a subject matter and title to it; and, 2d, persons competent to create it. The legal title of this money. at the time of this conversation, by the evidence, was in the husband, and no consideration is shown, passing to him, to change the title. (1 *McQueen on Husband and Wife*, 273.) If it was her separate estate the *onus* was upon her to have shown it. If the title was in him, there was no consideration on his part. I understand by separate estate, in a *feme covert*, such property as is in some way settled upon her for her separate, use, without any control over it on the part of her husband. (4 *Comst.* 11, *per Jewett, J.*) There is no evidence of this being the wife's *separate estate*.

But assuming the conveyance by the husband, George, to his wife, through the intervention of Mr. Lawson, to be a post-nuptial settlement, as I think we may, it would be a settlement that would be upheld in equity as between the husband and wife; but would still be presumptively void as against antecedent creditors of the husband. The evidence is, that at the time he made this conveyance to Lawson for her benefit, he was insolvent; that he owed debts to the amount of $3000 over and above the amount he owed his wife, and that all his property was conveyed to his wife. This was the 5th of May, 1862. The judgment was obtained 19th of June, 1862, about six weeks subsequently. These records are not in evidence, and it does not appear when the debts for which they were obtained were contracted. It seems to have been assumed on the trial, by both parties, to have been prior to the conveyance, and no point is made on the argument, that the debts were not antecedent to the conveyances to his wife; we therefore follow that assumption. So, too, the judgment appealed

Briggs *v.* Mitchell.

from is complained of as an invasion of what is called the "wife's equity" in the estate of her husband.

We have already shown that this estate belonged to the husband at law, and that this is an action in equity, by the creditors of the husband, to reach this estate conveyed to the wife. I do not understand that as against such antecedent creditors, the wife can set up her equity in such subsequent settlement. I do not understand that the question of the "wife's equity" arises here. What I understand is meant in the books, as the "wife's equity," is when a husband is obliged to resort to a court of equity in order to recover his wife's property, legal or equitable, or to assert his rights in regard to it; the courts then apply the rule, that "he who seeks equity, must do equity," and as the property of the wife is given by the marriage, to the husband, as a provision for the maintenance of both husband and wife, the courts will then interfere, and not apply it to the sole use of the husband, thus leaving it in his power to starve his wife; and especially in case the suggestion is made that it is necessary for the wife's security. The court will require from the husband, in such case, a consideration for the property, in the shape of a settlement on his wife. This settlement, so ordered by the courts, is a provision founded upon the principle of natural equity and justice, and its administration partakes of that same kind of parental care which courts of equity, standing in *loco parentis* to *femes covert*, exercise in behalf of infants and orphans. This is what is called "a wife's equity." (*Bell on Law of Property*, 114.) The defendants do not bring their case within the rule, so as to apply to it the principle of "a wife's equity."

It is also insisted that it is an act of great injustice to the defendant Cornelia R. Mitchell, that the court found that the deeds conveying this estate to her were made with fraudulent intent. It does not follow, from this finding, that the parties are found to have committed what is

called active or meditated fraud.   Acts may be performed consistent with entire innocence of intent, but which being contrary to some provision of the statute, which the statute declares fraudulent as to certain creditors, it is but the declaration of the language of the statute—a presumption cast by the statute arbitrarily.   A party in attempting to secure a bona fide debt, may do an act with the purest motive, yet if done so as to affect the rights of other creditors, against some statute provision, the law declares it fraudulent.   (*People* v. *Kelly*, 35 *Barb.* 454, 455.   *Birchell* v. *Strauss*, 28 *id.* 293.   *Spiers* v. *Joel*, 1 *Duer*, 696.)   The findings of the judge, that the acts in question were fraudulent, or done with fraudulent intent, may be merely constructive fraud, or as I understand the finding, it applies more particularly to the acts of the husband, George, than to the wife, Cornelia R. Mitchell, whom the evidence shows, merely accepted of a conveyance to secure to her the estate her husband had not taken care of as she directed.

It is insisted that the case of *Schaffner* v. *Reuter*, (37 *Barb.* 44,) is decisive of the questions arising in this.   The fund used in that case was the proceeds of real estate, which would not be by marriage given to the husband, but would be protected upon the same ground as a wife's separate estate.   If that case is not supported upon this distinction it cannot be supported at all; it would otherwise be in conflict with law well settled for a century.   I think there is a distinction between the cases; and the ground mentioned is one upon which, perhaps, *Schaffner* v. *Reuter* may be supported.   We can only follow it to that extent, if at all.   The property conveyed to the wife so far exceeds in value the amount of the money which it was conveyed to secure, it is of itself sufficient to authorize the holding that the conveyance was fraudulent as against antecedent creditors, without the finding of *actual* or meditated fraud.   It was the conveyance, not merely of enough

to secure his wife to the extent of the moneys claimed, but of all the remainder of his estate, and more than sufficient for the pretended object. A quiet acquiescence that her husband should use her estate as his own, mingling it indiscriminately with his own, in business, for a period of from twelve to nineteen years, without the recognition of its separate existence by even a written receipt, memorandum or separate investment, and without ever having during that period accounted for interest or principal, or even having talked about it, until the bona fide creditors were about to call for it, is a kind of trust or settlement that cannot be recognized by any rule of law or equity, to stand against the rights of antecedent creditors.

[SCHENECTADY GENERAL TERM, May 3, 1864. *Potter, Bockes, James* and *Rosekrans,* Justices.]